KANSAS CITY SOUTHERN RAILWAY COMPANY *v.* UNITED
STATES FIDELITY & GUARANTY COMPANY.

Opinion delivered June 6, 1927.

1.  CARRIERS—DELIVERY OF FREIGHT WITHOUT BILL OF LADING—CONSTRUCTION OF BOND.—Where a bond to secure a carrier against loss from delivery of freight without the bill of lading was clearly intended by the parties to be in accordance with Crawford & Moses' Dig., § 793, in order to avoid the penalty imposed by § 792, the court will presume that the amount fixed in such bond is double the value of the goods, as required by the statute,

whether the bond so provides or not, since the statute will be read into and become part of the bond under such circumstances.

2. PRINCIPAL AND SURETY—PAID SURETY NOT FAVORED.—A paid surety is not favored in law, any more than any other contracting party.

3. CARRIERS—CONSTRUCTION OF BOND FOR DELIVERY OF FREIGHT.— Where a surety was author of a bond to secure a carrier against loss for delivery of freight without the bill of lading, all provisions therein must be construed most strongly against it and favorably to the beneficiary.

4. CARRIERS—DELIVERY WITHOUT SURRENDER OF BILL OF LADING.—In a provision in a bond to secure a carrier against loss in delivery of freight without a bill of lading, providing that no delivery would be required or made where draft with bill of lading was in the bank at the point of delivery for collection, the word "made" *held* to mean "requested, accepted or received," and not to require the railroad to use reasonable diligence to ascertain whether the draft and bill of lading were in the bank.

Appeal from Sebastian Circuit Court, Fort Smith District; *John E. Tatum,* Judge; reversed.

*James B. McDonough,* for appellant.

*Hill & Fitzhugh,* for appellee.

HUMPHREYS, J.    This suit was brought by appellant against appellee in the circuit court of the Fort Smith District of Sebastian County to recover $3,000, and is predicated upon an alleged breach of the following bond, omitting clause B, which relates to a change in route, and clause C, which relates to stopping shipments in transit, which have no relation to the facts in this case.

"Know all men by these presents:

"Whereas, the undersigned principal ships and expects to ship or cause to be shipped, or to receive or cause to be received, as consignor or consignee, or otherwise, goods, wares, merchandise or chattels over the line of railroad operated by the Kansas City Southern Railway Company, Texarkana and Fort Smith Railway, herein referred to as the railway company, or carrier, or by other carriers operating lines of railroad connecting therewith, directly or indirectly; and

"Whereas, said principal, for his own advantage, expects to request, from time to time during the life of this bond, the railway company, or one or more of the carriers which may have transported or received such goods, wares, merchandise, or chattels shipped by said principal, or consigned to said principal, or consigned to others with directions to notify said principal, or consigned to said principal with directions to notify others, including what are commonly called other shipments, to-wit:

"A.   To undertake, at the request of said principal, to deliver or cause to be delivered to said principal, or to others, such goods, wares, merchandise or chattels, prior to surrender of the original shipping receipt or bill of lading therefor.

"Now therefore, in consideration of the premises and of the compliance with any request of said principal or of any attempts or efforts to comply with the same by the railway company, or by any connecting carrier at the request of the railway company, we, the undersigned principal and surety (or sureties), jointly and severally undertake, covenant and agree with each railway company and connecting carriers, that, in the event any such request or requests shall be made by said principal during the life of this bond, and any such request shall be complied with, or any effort to be made to comply with the same by any of said carriers, that we and each of us shall and will fully indemnify, protect and save harmless each and every said carrier and all carriers complying therewith or causing compliance with such request or requests, or attempting to do so, from and against any and all liability, suits, actions, costs, damages, expenses, losses and claims for loss or damage of every kind and nature which might or may be made against, or suffered, sustained or incurrd by any such carrier or carriers, on account of or by reason of any compliance with any such request, or requests, or of any attempt or attempts to comply with the same, or in any way connection there-

with, including all reasonable attorney's fees paid or incurred in the premises by such carrier or carriers.

"1. The railway company and such other carriers may, in their discretion, settle and pay any claim that may be made against it or them on account of the compliance with such request of the principal, and the amount of such settlement shall be repaid by the principal or sureties upon receipt of bill from the railway company or such other carriers.

"2. That neither the principal nor its agents nor employees shall request, accept or receive from said railway company the delivery or possession of any freight to which it would not be entitled upon the production and surrender of bills of lading or shipping receipts therefor, and that no delivery of freight on account of this bond will be requested or made where the draft with the bill of lading is then in any bank at point of delivery for collection.

"3. That said principal shall and will promptly, after the delivery of such freight, not, however, to exceed five (5) days, surrender to the railway company the original bill of lading or shipping receipt therefor, duly indorsed, or, if any such bill of lading or shipping receipt shall have become delayed or lost, will, if and when same shall have been received or found, promptly deliver to said railway company.

"4. The liability of the principal and of the surety (or sureties) under this bond shall not exceed the sum of three thousand dollars ($3,000) for each principal and each surety.

"The surety (or sureties) shall not be liable hereunder for claims accruing after the expiration of sixty (60) days after the receipt by said railway company of written notice from the surety (or sureties) of its desires to withdraw as surety (or sureties) for said principal, and any claim hereunder against the surety (or sureties)

must be duly presented to the surety (or sureties) within nine (9) months after such determination of the surety's (or sureties') liability.

"In event of any payment by the surety (or sureties) of any claim hereunder, the surety (or sureties) shall be subrogated to all the rights of the obligee with respect to such claim, and the obligee shall execute the necessary assignment of the said subrogation.

"No such carrier or carriers shall in any event be liable or responsible to said principal by reason of any failure or of any delay to comply with, or of errors or mistakes in complying or attempting to comply with, such request or requests of such principal, or to accomplish in any respect whatsoever any of the matters so requested.

"6. This agreement and all of the covenants and undertakings thereof shall inure to the benefit, separately, of each of the carriers over whose lines any such shipment or shipments, or any part thereof, may be transported, or by whom any such goods, wares, merchandise or chattels may be received, or delivery thereof may be made, and also to the benefit of the successors and assigns of each of said carriers, and the same may be enforced jointly or severally by such carriers as their interest may be, joint or several.

"7. This bond shall not be void on the first of any subsequent breach thereof, or on the first of any subsequent suit and recovery thereon, but may be sued on and enforced until the full sum herein named shall have been recovered.

"This bond shall become effective on the date of its execution, and shall continue in force as provided for in § 3, except that it is distinctly understood and agreed that the circumstances, in the opinion of the officers, agents or employees of said railway company, fully justify such compliance, and that said railway company may at any time discontinue, without notice, the making

of deliveries or charges under any or all of the aforesaid conditions.

"In witness whereof the undersigned principal (or principals) and surety (or sureties) have executed this instrument this 22d day of January, A. D. 1923.

"Western Grain Company (Seal).

"By W. J. Pendergrass, President.

"Attest: Chas. F. Kent, Secretary.

"United States Fidelity & Guaranty Company,

"By W. E. Atkinson.

"Approved: I. C. McGee, Treasurer" (Seal).

The gist of the complaint was that the bond sued upon was executed under § 793 of Crawford & Moses' Digest to enable appellant, without violating § 792 of said Digest, to deliver three cars of grain and other products to the consignee or principal in the bond, which had arrived in Fort Smith, without first presenting the bills of lading therefor, to which drafts had been attached; that said bond had been breached by failure of the principal in the bond to pay the several drafts and deliver said bills of lading to it, by reason of which failure it was compelled to pay the drafts attached to the several bills of lading in order to obtain possession of them, same having been forwarded to the First National Bank at Fort Smith for collection.

Two defenses were interposed to the alleged cause of action by appellee. First, that the bond did not conform to the requirements of said statute; and second, that, under § 2 of the bond, appellant was prohibited from delivering the several cars of grain and other mill products, because the bill of lading for each of the three cars was in the possession of the First National Bank at Fort Smith at the time appellant delivered said cars to the principal in the bond, Western Grain Company.

The cause was submitted upon the pleadings, testimony introduced by the respective parties and the instructions of the court, which resulted in a judgment

dismissing the complaint of appellant, from which an appeal has been duly prosecuted to this court.

(1). The two sections of Crawford & Moses' Digest alluded to, the one prohibiting the delivery by common carriers of shipments without the presentation of bills of lading, and the other providing for the delivery of shipments without the presentation of bills of lading upon the execution of a bond, are as follows:

"Section 792. Receipts given by any warehouseman, wharfinger or other person or firm for any goods, wares, merchandise, cotton, grain, flour or other produce or commodity, stored or deposited, and all bills of lading and transportation receipts of every kind given by any carrier, boat, vessel, railroad, transportation or transfer company, may be transferred by indorsement in writing thereon, and the delivery thereof so indorsed, and any and all persons to whom the same may be transferred shall be deemed and held to be the owner of such goods, wares, merchandise, cotton, grain, flour or other produce or commodity, so far as to give validity to any pledge, lien or transfer given, made or created thereby, as on the faith thereof, and no property so stored or deposited, as specified in such bills of lading or receipts, shall be delivered, except on surrender and cancellation of such receipts and bills of lading; providing, that all such receipts and bills of lading which shall have the words 'not negotiable' plainly written or stamped on the face thereof, shall be exempt from the provisions of this act.

"Section 793. It shall be lawful for a shipper or a consignee of goods to make, execute and deliver to, and the carrier to take and receive, a good, sufficient and valid bond in a sum double the value of the goods, conditioned that the shipper or consignee shall, within a reasonable time thereafter, deliver to the carrier the original receipts and bills of lading issued for said goods or shall pay the value of said goods to the carrier upon demand; and upon the execution and delivery of said good, sufficient and valid bond, as aforesaid, it shall be

lawful for the carrier to deliver up the said goods to the shipper or consignee, without requiring the immediate surrender of said original bills of lading and receipts, and for so doing the carrier shall not incur the penalty of the law as set forth in this chapter.''

The objection made to the bond is that it did not obligate the principal and surety in a sum double the value of the goods, conditioned that the shipper or the consignee would deliver the bills of lading issued for said goods to the carrier within a reasonable time, or else pay it the value of said goods upon demand. The preamble, § A and § 3 of the bond indicate that the intention of the parties was to execute a bond in accordance with said § 793 in order to avoid the penalty imposed by said § 792. The amount or $3,000 is fixed in the bond, which we must presume to be a sum in double the value of the goods, whether it specifically says so or not. Where it is manifest that the intention of the parties was to execute a bond under this or any particular statute, the rule is that the statute will be read into and become a part of the bond. There is no doubt that this bond was intended as a continuing bond, and that its purpose was to cover each shipment, when delivered without the production of the bill of lading, at the request of the consignor or consignee. Under this construction of the bond the sum of $3,000 was more than double the value of either one of the cars shipped and delivered to the consignee. Appellee is a paid surety, and is not favored in the law any more than any other contracting party. It was the author of the bond, and all of the provisions therein must be construed most strongly against it and favorably to the beneficiary. Any other construction would allow appellee to take advantage of its own wrong, errors and inaccuracies in the preparation of the bond or contract.

(2). The facts are undisputed. The Western Grain Company, the principal in the bond, purchased three cars of corn and other mill products from different grain

or mill companies. Each company shipped the car purchased from it to shipper's order, "Notify the Western Grain Company," and to the bill of lading received by each the shipper attached a draft on the Western Grain Company for the purchase price of the car, including the freight thereon. Each bill of lading and draft was delivered to the respective shipper's bank and credited to his account. The several bills of lading with drafts attached were forwarded by the receiving bank, through correspondents, to the First National Bank of Fort Smith, Arkansas, for collection. The First National Bank of Fort Smith received all three bills of lading with drafts attached severals days before the cars arrived. The Western Grain Company had accepted one of the drafts and the bank had paid it and charged same to its account before the delivery of the particular car of grain to the Western Grain Company. The Western Grain Company requested appellant to deliver the cars of grain to it without presenting the bills of lading; and, in accordance with its custom, the appellant complied with its request. After the delivery of the cars, and before the Western Grain Company paid the several drafts, it failed in business, and was unable to pay them. In order to obtain possession of the bills of lading and avoid the penalty imposed by statute upon appellant, it was compelled to pay the drafts. Appellant delivered the cars to the Western Grain Company, the consignee and principal in the bond, without actual knowledge that the bills of lading were in the First National Bank of Fort Smith for collection, or without making any investigation as to the whereabouts of the bills of lading and drafts.

Appellant and appellee each requested a peremptory instruction, at the conclusion of the testimony, which the court declined to give, and, instead, sent the case to the jury upon the issue of whether appellant exercised reasonable diligence to discover that the bills of lading with drafts attached were in the bank at Fort Smith when the deliveries of the cars were made. The trial court con-

strued § 2 of the bond to mean that appellee was not liable thereon, unless appellant used reasonable diligence to ascertain whether the bills of lading with drafts attached were in the bank at Fort Smith at the time it made the several deliveries of the cars to the Western Grain Company.

The majority of the court are of the opinion that the trial court erred in its interpretation of said section of the bond. The majority interpret the word "made" contained therein as synonymous with "request, accept or receive" in the first part of the section and the word "requested" disjunctively connected with it. They are impelled to the construction because a request on the part of the principal in the bond for a delivery of the shipments necessarily amounted to a statement or representation that the bills of lading attached were not in the bank for collection at the point of delivery. Chief Justice HART and the writer are of the opinion that the words are not synonymous, and that the word "made" relates to and is a restriction upon appellant, whereas the word "request, accept, receive" and "requested" relate to the principal in the bond, and are restrictions upon it. We think our construction correct, because a delivery of the property could not have been made by any one except the carrier in possession thereof. Under the majority view the trial court should have peremptorily instructed a verdict in favor of appellant for $3,000 and interest.

On account of the error indicated the judgment is reversed, and a judgment will be entered here in favor of appellant for said amount.